ANGEL FLORES, Plaintiff-Appellant, *v.* U.S. INDUSTRIES, INC., Defendant-Appellee.

First District (5th Division)    No. 78-1291

Opinion filed February 1, 1980.

Reed, Lucas & Doherty, of Chicago (Edward V. Scoby, of counsel), for appellant.

William V. Johnson, of Johnson, Cusack & Bell, Ltd., of Chicago (Thomas H. Fegan, of counsel), for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

The sole issue presented by plaintiff in this appeal is whether the trial court erred in directing a verdict in favor of defendant in this product liability action.

Plaintiff was injured in May 1971, at his place of employment (Electro Metal Company) while working on a punch press manufactured by defendant. The press, as sold to Electro Metal, contained a switch

which, in one position, allowed the operator to activate the ram by simultaneously depressing two palm buttons and, in the other, by depressing a foot pedal. At the side of the machine, a selector switch provided four modes of operation, three of which are relevant here— continuous, run, and off. In the "continuous" position, the ram would descend repeatedly as long as either the foot pedal or two palm buttons were depressed. The "run" mode provided for single stroke operations whereby the ram would descend once each time the buttons or pedal were depressed. In the "off" position, all controls, including the palm buttons and foot pedal, were deactivated. This selector switch was key operated; however, it was possible to set the switch in a given position and remove the key without locking it, thus allowing any individual to turn the switch by hand. A red stop button was located between the two palm buttons. When depressed, it removed the power and the press could not be reactivated unless the operator pulled the stop button out again.

According to plaintiff, just before his injury occurred he had been operating the press in the continuous mode by means of the foot pedal. One of the stamped parts "came out bad," so he stopped using the foot pedal and reached into the area between the dies with his right hand to align the material. At this point he was standing directly in front of the stop button, three feet away from the foot pedal, and was leaning on the machine with his left hand. Although he did not touch any controls, the ram descended on his right hand, causing severe injury.

Plaintiff then brought the instant product liability action against defendant and, in his amended complaint, alleged that the press was defective and unreasonably dangerous from the time of manufacture up to the time of the accident in one or more of the following respects: (1) that it failed to contain a safety control switch readily accessible to the operator to deactivate the ram control circuitry; (2) that it was not equipped with a safety block or prop readily accessible to the operator; and (3) that it was not equipped with an interlocked barrier guard or movable barrier gate to be used during foot control operations. He also alleged that such unreasonably dangerous condition proximately caused his injury.

At trial, plaintiff testified that the accident occurred as described above; that there was no guard surrounding the die area of the machine; that he never saw a guard on any press during the time he worked at Electro Metal; that "restraints" were attached to the wall behind him; that these restraints, however, when attached to the operator's wrists, were of such limited length that they prevented the operator from placing his hands in the die area at any time and therefore could not be used in the instant situation, where it was necessary for him to reach into the die area from time to time to adjust the materials; and that there were no

"pullback" devices attached to the wall (belts which attach to the operator's wrists but, while allowing him to reach in between the dies, would pull the operator's wrists away from the press when the ram descends).

Dr. Ralph Armington, a professor of electrical engineering called as an expert witness by plaintiff, testified that he studied the photographs and schematic diagram of the press in question; that, in his opinion, the cycling of the press was caused by two bare wires in the left palm button housing which came into contact with each other when plaintiff leaned against the assembly; that as a safety feature, the press should have contained "a second switch * * * hand operated and within easy reach of the operator" which would have disconnected the power supply from the control circuitry; that such a switch would have prevented plaintiff's injury if he used it; and that, without this proposed switch, the machine was in his opinion unreasonably dangerous. On cross-examination, he admitted that he never actually examined the press which caused the injury; that there was no evidence that any of the wires in the left palm button housing were bare; that he assumed pressure from plaintiff's body caused the bare wires to come into contact; that the selector switch, when in the "off" position, deactivates the control circuitry—thus accomplishing the same result as his proposed "second switch"; that the proposed switch would differ from the existing selector switch in that it would be more accessible to the operator and could be used without a key; and that pullbacks, if properly installed, would have prevented plaintiff's injury.

George Harper, a safety consultant called by plaintiff, testified that he examined the photographs and drawings pertaining to the press in question; that at the time of the accident there were safety standards promulgated by the American National Standards Institute (ANSI) regarding punch presses; that a pertinent standard stated that "[e]ach press shall be equipped and operated with a point of operation guard or a point of operation safety device"; that many options are available in terms of point of operation guards and protection devices, depending to some extent on the type of operation the machine is being used for; that among these are fixed barrier guards (which surround the point of operation but cannot be readily removed or opened, and thus prevent the operator from placing his hands in the die area), interlocking barrier guards (which also surround the point of operation but can be opened and, if opened, electrically deactivate the controls), and die blocks (metal props which are placed between the dies and prevent them from closing while the operator is setting or replacing the dies). He gave an opinion that the press in question was unreasonably dangerous at the time of manufacture and did not meet ANSI standards because "there was no adequate guarding, no adequate barrier device that would prevent the man's hands from

entering, and there was no [prop] available to give him the protection he should have to enter the danger zone." On cross-examination, he stated that the palm buttons by which the press could be activated qualified as point of operation guards under ANSI standards, but that the problem he saw in the machine was a lack of adequate guarding when the press was operated by foot pedal in the continuous mode; that since defendant incorporated the palm buttons, the strict terms of the ANSI standards may not have been violated, but they were violated "in spirit"; and that the appropriate size of the die blocks to be used depended upon the size of the dies installed by the user—which the manufacturer of the press would not know.

Stephen Finley, plaintiff's foreman, was called as a witness by defendant and testified that barrier guards had been supplied by Electro Metal and were to be attached on continuous stroke operations; that no restraints were installed but pullback devices had been installed shortly after the press was purchased and were available at the time of the accident; that die blocks were furnished by Electro Metal and generally were used only by the die setters—not the press operators; that the selector switch at the side of the press would turn off the machine; and that the stop button located between the two palm buttons deactivated the controls when depressed. On cross-examination, he answered that the barrier guards furnished were not of the interlocking type.

Ralph Barnett, a professor of mechanical and aerospace engineering called by defendant, testified as an expert witness that he examined the press in question in May 1976; that he observed pullbacks and fixed barrier guards; that the purpose of a die block is to hold the upper die in place while it is being removed or installed and that it could not withstand a power stroke of the ram; that the stop button performs exactly the same function as the switch proposed by Professor Armington; that in his opinion the press was not only safe as sold but was also safe at the time of the accident, because of the palm buttons and the pullbacks.

At the close of the evidence, defendant moved for a directed verdict, and the trial judge reserved ruling on the motion. The case was submitted to the jury and, when it was unable to reach a verdict, a mistrial was declared and the court then granted defendant's motion for directed verdict. This appeal followed.

OPINION

Plaintiff's sole contention here is that the trial court improperly granted defendant's motion for a directed verdict. In evaluating this contention, we are mindful that directed verdicts should be entered "only in those cases in which all of the evidence, when viewed in its aspect most

favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

■■ Looking to his amended complaint, it is noted that plaintiff alleges three specific defects which rendered the press unreasonably dangerous. First, that the press "[f]ailed to contain a safety control switch readily accessible to the operator to deactivate the ram control circuit." He points out that such a switch was proposed by plaintiff's expert (Armington), who gave an opinion, in answer to a hypothetical question, that the ram descended because of a short circuit resulting from the pressure of plaintiff's body against the machine—which caused contact between two electrical wires which must have been bare. He stated that his proposed switch, if it had been used by plaintiff, would have prevented the injury. We find nothing in the record to support this opinion. It is based on the assumption that there was a short circuit caused by contact between some bare wires. We note no basis for this assumption, as there is no evidence of any such bare wires nor did the hypothetical question given Armington contain any statement that there were bare wires. Moreover, it is uncontradicted that the press had two switches which performed the same function as the switch proposed by Armington. Finley and defendant's expert (Barnett) testified to the existence of a red stop button located between the palm buttons—which would deactivate the machine when depressed—and Barnett specifically testified that this red stop button did exactly what Armington's proposed switch would do. Further, Finley and Barnett also testified to the existence of a selector switch on the press which would also cut off power when turned to the "off" position. Armington, while admitting on cross-examination that this selector switch would accomplish the same purpose as the switch he proposed, suggested that the selector switch was an inadequate safety feature because he believed a key was needed to turn it. However, Barnett testified that the selector switch could be turned without a key and, in any event, that the stop button could be used for the same purpose by the operator. We therefore conclude that the absence of any such proposed switch was not a defect rendering the press unreasonably dangerous and could not have been a proximate cause of plaintiff's injury.

Secondly, plaintiff alleges in his amended complaint that the press was unreasonably dangerous because it "[w]as not equipped with a safety block or prop readily accessible to the operator." We think, however, that the testimony appears clear that while the press was sold by defendant without die blocks, such blocks were in fact provided by Electro Metal. Finley stated unequivocally that they were supplied by Electro Metal and

were available for use by the die setters. Plaintiff, on the other hand, testified only that he did not know whether die blocks were on the premises.

The significance of an employer providing a safety device not originally supplied by the manufacturer was illustrated in *Rios v. Niagara Machine & Tool Works* (1974), 59 Ill. 2d 79, 319 N.E.2d 232. In that case, plaintiff (an employee of Hammond Organ Company) was injured while working on a punch press manufactured by defendant when he reached into the machine to remove a piece of metal and the ram unexpectedly descended. The press, as sold by defendant, contained no safety devices; however, Hammond had installed a pullback device which plaintiff was wearing but which was broken at the time of the accident. Plaintiff brought a product liability action, alleging that the press was unreasonably dangerous in that it was not equipped with a proper safety device and that such unreasonably dangerous condition proximately caused his injury. The supreme court held for defendant on the basis that there was no causal connection between the alleged unreasonably dangerous condition of the machine and plaintiff's injury, stating:

> "The evidence indicates that the safety device selected by Hammond was one which was appropriate for the use being made of the machine by the plaintiff at the time of his accident, and there is no evidence that Hammond had installed a defective safety device. Once this device had been attached to the machine, whatever unreasonably dangerous condition existed when it left the defendant's control by reason of the absence of safety devices were fully corrected.
>
> * * *
>
> Since there is no evidence which causally connects the plaintiff's injury with the unreasonably dangerous condition of the machine alleged in the complaint he may therefore not recover against Niagara under the principles of strict tort liability." (59 Ill. 2d 79, 85-86, 319 N.E.2d 232, 236.)

In the instant case, as in *Rios*, once Electro Metal supplied die blocks, any dangerous condition existing by virtue of defendant's failure to provide such die blocks was remedied. Thus, the causal connection between the alleged defective condition of the press, as sold by defendant without die blocks, and plaintiff's injury was broken. Furthermore, we note that Barnett testified that the purpose of a die block is to hold the upper die in place when it is being installed or removed and that it could not withstand the force of the ram descending. Thus, it appears that such device would not have prevented plaintiff's injury and that its alleged absence would not render the press unreasonably dangerous. Accordingly, we find this second allegation of defect to be unsupported in the evidence.

■ Thirdly, plaintiff alleges in his amended complaint that the press was defective and unreasonably dangerous because it "[w]as not equipped or provided with a point of operation interlocked barrier guard or movable barrier gate to be used during foot control operations." The only testimony regarding any kind of barrier guard was offered by plaintiff's expert (Harper), who gave an opinion that the press was unreasonably dangerous because "there was no adequate guarding, no adequate barrier device that would prevent the man's hands from entering," and plaintiff has referred us to no opinion in the record by either of his expert witnesses (Harper and Armington) or to the testimony of any other witness, and we also have found none, that the absence of an interlocking barrier guard specifically created an unreasonably dangerous condition. Further, it appears that the safety function of the interlocking barrier gates, as explained by Harper, was already performed by existing controls on the press. Harper testified that the significant aspect of such gates is that they electrically deactivate the controls when they are opened, and it is clear from the testimony of Finley and Barnett, as well as the testimony of Armington (on cross-examination) that the same result (deactivation of the controls) is achieved when the red stop button is depressed or the selector switch is turned to "off." Thus, we find no support in the record for plaintiff's third allegation in his amended complaint that the absence of interlocking barrier guards was a defect rendering the press unreasonably dangerous.

■ In the light of the above, we conclude that plaintiff has not established any of the defective conditions asserted in his amended complaint which allegedly caused the press to be unreasonably dangerous and, accordingly, we affirm the order appealed from directing a verdict in defendant's favor.

Affirmed.

LORENZ and MEJDA, JJ., concur.